UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 12-10329-RGS

UNITED STATES OF AMERICA

v.

MARCUS WILLIAMS

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

May 15, 2014

STEARNS, D.J.

Defendant Marcus Williams, who is charged as a felon in possession of a firearm, seeks to suppress a handgun seized by Boston police officers in the early morning hours of May 30, 2012, from a car in which he was riding as a passenger.[1] Williams argues that the police lacked probable cause to search under the hood of the vehicle where the gun was found. Hearings to receive evidence and to hear oral argument were held on October 22, 2013, November 26, 2013, and February 20, 2014. At counsels' request, additional time was granted to file supplemental memoranda based on the testimony that emerged at the hearing. Briefing concluded on March 18, 2014.

Based on the credible testimony and the exhibits received in evidence, I find the following material facts.

---

[1] The motion also seeks to suppress statements made by Williams after his arrest, but none were adduced at any of the hearings.

1. At approximately 12:35 a.m. on May 30, 2012, an excited young woman, later identified as Kayce Topin, made a 911 call on her friend Kayla Harris's cell phone from the sidewalk outside the Dublin House Bar at Columbia Road and Stoughton Street in Dorchester, Massachusetts. The call was taken by a State Police dispatcher. Topin told the dispatcher that police needed to come to the Dublin House because of a "man there with a gun." As the call was in the process of being transferred to the Boston police, Topin became frustrated by the delay and hung up. The Boston police dispatcher confirmed the address of the Dublin House with an information operator, broadcast a report of "a man with a gun at Dublin," and then called the cell phone number back. Harris answered, and in an excited conversation, both women expressed anger at the slowness of the police response. However, they told the dispatcher that the man with the gun had just left in a silver Infiniti, license plate # 213 SV3, and that he had a gun. They described the man as light-skinned with braided hair. Police arrived before the conversation finished. It ended with one of the women saying, "They already caught them."

2. Officers Joseph McDonough and Matthew Delorey were the first officers to arrive at the scene. The Columbia Road/Stoughton Street area was known to McDonough as a "trouble spot." As the officers arrived, they observed Topin and Harris, in front of Dublin House, still on the phone with the dispatcher. They appeared frantic and shaken and were shouting. Topin told McDonough that she and Harris had argued with a man named Marcus who had called them "snitches," and when they objected, threatened to "go to

2

the hood [of his car] . . . You know what's in there." Topin reported that she had "almost got shot." While she stated that she had not seen a gun, she knew that Marcus had one in the car.[2] The women told the officers that Marcus had driven away after placing something under the hood or in the trunk of his car.

3. As the interview continued, Topin's eyes lit up as a silver vehicle approached. She exclaimed "That's the car right there. That silver Infiniti." McDonough ran towards the car while as many as ten patrol cars converged on the scene. McDonough radioed an order to the converging officers to stop the Infiniti.

4. Delorey reached the car first and at gunpoint ordered Williams, who was seated in the rear passenger seat, to get out. McDonough then popped the hood of the Infiniti and retrieved a handgun from the insulation shelf in the engine compartment.

5. The entire sequence of events was captured on video by a Department of Homeland Security (DHS) camera installed adjacent to the Dublin House. The video over a 6-minute span depicts a confrontation between Williams, Topin, and Harris during which Williams exits the Infiniti, approaches the women, exchanges words, returns to the Infiniti, starts back across the street towards the women, and is restrained by one of his companions. Williams then

---

[2] In his grand jury testimony, McDonough recalled that Topin had specifically said that the gun was "under the hood" of the car, although there was some evidence that the word "trunk" might also have been used. There is no question that on the video, the women clearly single out the Infiniti and point the officers in its direction.

opens the hood of the Infiniti, inserts his left arm into the engine compartment, closes the hood, and gets back into the car. The Infiniti pulls away as Harris crosses the street to get a view of the license number. The Infiniti reappears 5 minutes later as police have begun arriving at the scene. Williams is now, however, a passenger in the back seat of the car.[3]

RULINGS OF LAW

"If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). The search may extend to compartments of the car (the trunk, glove compartment, console, and engine area), whether locked or unlocked, and to containers, open or closed, that might conceal contraband or evidence of the suspected crime. *Id.* at 817-824.[4] Probable cause means "reasonable cause," something

---

[3] Harris and Topin were later that morning interviewed by Sgt. Det. Michael Stratton at District B-2. Although the contents of the interviews cannot be factored into the evaluation of probable cause to search the Infiniti, the accounts given to Sgt. Det. Stratton are consistent with McDonough's and Delorey's testimony and the DHS video.

[4] Defendant is correct that a search of an automobile incident to arrest is confined to the passenger compartment and to areas of the vehicle (like a hatchback) that are "reachable without exiting." *United States v. Russell*, 670 F.2d 323, 327 (D.C. Cir. 1982); *see also United States v. Marchena-Borjas*, 209 F.3d 698, 700 (8th Cir. 2000) (the rule of *New York v. Belton*, 453 U.S. 454, 460 n.4 (1981) provides insufficient justification for the search of an engine compartment incident to arrest). The argument, however, elides over the rule established by *Ross* in cases like this one where there is probable cause to believe that a vehicle contains contraband or evidence of a crime.

4

significantly less exacting than "more likely than not" or "by a preponderance of the evidence." *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979). Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (*plurality opinion*) (internal citation omitted). "The standard of probable cause is the probability, not a *prima facie* showing, of criminal activity." *United States v. Ciampa*, 793 F.2d 19, 22 (1st Cir. 1986) (emphasis in original).[5]

Probable cause also recognizes that police are often called upon to act in haste where a threat to personal or public safety exists. In these situations, probable cause necessarily assumes a flexible texture proportionate to the stakes involved. "Once presented with an emergency situation, the police must act quickly, based on hurried and incomplete information. Their actions,

---

[5] While Williams argues that Massachusetts law establishes a higher standard of probable cause in cases involving firearms and threats than does federal law (which I doubt), the argument is besides the point as this court is bound to apply federal, and not constitutional state law, in interpreting the Fourth Amendment. See *Virginia v. Moore*, 553 U.S. 164, 174 (2008) ("A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional."); *United States v. Charles*, 213 F.3d 10, 19 (1st Cir. 2000), quoting *United States v. Sutherland,* 929 F.2d 765, 769 (1st Cir. 1991) ("Evidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings without regard to state law.").

therefore, should be evaluated 'by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences.'" *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002) (footnotes and citations omitted). "As the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventive action. In circumstances that suggest a grave threat and true emergency, law enforcement is entitled to take whatever preventive action is needed to defuse it." *Mora v. City of Gaithersburg*, 519 F.3d 216, 224-225 (4th Cir. 2008).

While there is no "firearms exception" to the Fourth Amendment, "[w]hen a tip . . . concerns the possession of a firearm, it deserves the immediate attention of law enforcement officials." *Commonwealth v. Stoute*, 422 Mass. 782, 790 (1996); *see also United States v. Nelson*, 284 F.3d 472, 483 (3d Cir. 2002) (when police receive a report that a suspect is using a firearm to commit a violent crime, the United States Supreme Court's holding in *Florida v. J.L.*, 529 U.S. 266 (2000) does "not disturb the officers' ability to consider the prospect of harm to others or themselves" in assessing whether reasonable suspicion justifies intervention); *Holloway*, 290 F.3d at 1338 (where police responded to a 911 call reporting gunshots inside a home, the "crucial distinction" making *J.L.* inapplicable was the existence of a true emergency); *United States v. Wooden*, 551 F.3d 647, 650 (7th Cir. 2008) (911 report of a domestic quarrel and a man with a gun, distinguishing *J.L.* as a case "in which

there was no apparent need for haste"); *People v. Dolly*, 53 Cal. Rptr. 3d 803, 807 (2006) (anonymous tipster's report that a man had threatened him with a gun created a "grave and immediate risk").

In evaluating probable cause or reasonable suspicion, an officer is not limited to his personal observations, but may rely on information provided by others, so long as it is shown to have been credible. *Adams v. Williams*, 407 U.S. 143, 147 (1972). A presumption of credibility attaches to crime victims, disinterested citizens, witnesses to a crime whose identities are known to police, and persons who "place their anonymity at risk."[6] *See J.L.*, 529 U.S. at 276 (Kennedy, J., concurring); *see also United States v. McMullin*, 568 F.3d 1, 6 (1st Cir. 2009) (officer undertook corroborative investigation to establish reliability of witness); *United States v. Romain*, 393 F.3d 63, 73-74 (1st Cir. 2004) (a face-to-face encounter allows an officer to factor demeanor into his assessment of the informant's reliability); *United States v. Valentine*, 232 F.3d 350, 354-355 (3d Cir. 2000) (same, officer stood "face-to-face" with tipster).

Finally, in assessing probable cause, courts are guided by the collective knowledge or "fellow-officer" rule, that is, where police are engaged in a

---

[6] "The rationale for according more weight to the reliability of persons who are either identified or able and not unwilling to be identified is that these individuals do not 'have the protection from the consequences of prevarication that anonymity would afford.' Identified and readily identifiable individuals expose themselves to charges of filing false reports, and they risk reprisal from those they accuse." *Commonwealth v. Love*, 56 Mass. App. Ct. 229, 234 (2002) (internal citations omitted); *see also Navarette v. California*, 134 S. Ct. 1683, 1689 (2014) (noting a caller's use of the 911 emergency system as an "indicator of veracity").

collaborative effort, the knowledge of each officer may be pooled in establishing probable cause. *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002); *see also United States v. Fiasconaro*, 315 F.3d 28, 36 (1st Cir. 2002) (the focus is on the aggregate knowledge possessed by all of the officers involved in the investigation). *Cf. United States v. Hensley*, 469 U.S. 221, 231 (1985) (police may justifiably rely on wanted bulletin issued by neighboring department).[7]

CONCLUSIONS OF FACT AND LAW

In sum, we have : (1) an agitated 911 call made on a personal cell phone by two young women reporting a man with a gun at a known trouble spot at a late hour; (2) an arrival by police on the scene while the call is still in progress; (3) a face-to-face interview of the women by the first-responding officers; (4) during which they report having been threatened within the past five or six minutes by a man with a gun named Marcus; (5) who has just left the scene in a silver Infiniti with a license plate # 213 SV3 in which a gun is hidden under the hood (or in the trunk – for purposes of probable cause it would not matter which); and (6) who, in the midst of the interview, suddenly exclaim "That's the car!" pointing to the silver Infiniti just returning to the scene. There perhaps is a nuance of legal sophistication that has been overlooked in my analysis, but if these facts do not constitute probable cause for the search of a vehicle for a firearm, I would be hard pressed to imagine what would (other than a first-hand witnessing of all of the events by the officers themselves).

---

[7] The rule is the same under Massachusetts law. *See Commonwealth v. Montoya*, 464 Mass. 566, 576 (2013).

ORDER

For the foregoing reasons, defendant's motion to suppress the firearm and ammunition seized from under the hood of the Infiniti is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE